# UNITED STATES DISTRICT COURT
for the
Eastern District of California

FILED
APR 27 2016
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
    DEPUTY CLERK

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| | ) | 2:16-MJ-0088  EFB |
| Jason Sebastian Sparks | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __February 2015 through October 2015__ in the county of __Butte__ in the __Eastern__ District of __California__, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2252(a)(2) | Receipt of Child Pornography |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
Complainant's signature

Special Agent Matthew Catalano
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4-27-2016

_____
Judge's signature

City and state:  Sacramento, California         Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

BENJAMIN B. WAGNER
United States Attorney
BRIAN A. FOGERTY
MATTHEW G. MORRIS
SHELLEY D. WEGER
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. |
| Plaintiff | AFFIDAVIT |
| v. | |
| JASON SEBASTIAN SPARKS, | |
| Defendant. | |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Matthew Catalano, ("Your Affiant"), a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), Sacramento Division, Chico Resident Agency, having been first duly sworn, do hereby depose and state as follows:

1. I have been employed as a Special Agent of the FBI for approximately six years, and am currently assigned to the Sacramento Division, Chico Resident Agency. Some of my investigative responsibilities include the investigation of criminal violations relating to child exploitation, including violations pertaining to the illegal production, distribution, receipt and possession of visual depictions of minors engaged in sexually explicit conduct and child pornography (as those terms are defined in 18

1

U.S.C. § 2256 and hereinafter referred to collectively as "child pornography") in violation of 18 U.S.C. §§ 2251, 2252(a) and 2252A. In the course of my duties, I have participated in the execution of numerous search and arrest warrants, including several relating to child exploitation investigations. Moreover, I am a federal law enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C. §§ 2251, 2252(a)(2), and 2252(A), and I am authorized by the Attorney General to request an arrest warrant.

2. There is probable cause to believe that Jason Sebastian SPARKS ("SPARKS") has violated 18 U.S.C. § 2252(a)(2) (receipt of child pornography).

3. The statements contained in this affidavit are based in part on: information provided by FBI Special Agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents, information gathered from the service of administrative subpoenas; the results of physical and electronic surveillance conducted by law enforcement agents; independent investigation and analysis by FBI agents/analysts and computer forensic professionals; and my experience, training and background as a Special Agent with the FBI. Because this affidavit is being submitted for the limited purpose of supporting the criminal complaint, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested complaint.

## RELEVANT STATUTES

4. This investigation concerns alleged violations of: 18 U.S.C. §§ 2252(a)(2), Receipt of Child Pornography, which prohibits a person from knowingly receiving any child pornography or any material that contains child pornography as defined in 18 U.S.C. § 2256(8), that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

5. The following definitions apply to this Affidavit and attachments hereto:
   a. "Bulletin Board" means an Internet-based website that is either secured (accessible with a password) or unsecured, and provides members with the ability to view postings by other members and make postings themselves. Postings can contain text messages, still

2

images, video images, or web addresses that direct other members to specific content the poster wishes. Bulletin boards are also referred to as "internet forums" or "message boards." A "post" or "posting" is a single message posted by a user. Users of a bulletin board may post messages in reply to a post. A message "thread," often labeled a "topic," refers to a linked series of posts and reply messages. Message threads or topics often contain a title, which is generally selected by the user who posted the first message of the thread. Bulletin boards often also provide the ability for members to communicate on a one-to-one basis through "private messages." Private messages are similar to e-mail messages that are sent between two members of a bulletin board. They are accessible only by the user who sent/received such a message, or by the Website Administrator.

b. "Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, legally obscene or that do not necessarily depict minors in sexually explicit conduct.

c. "Child Pornography," as used herein, is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d. "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

e. "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users. A web server, for example, is a computer which hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A

domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

f. "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g. "Host Name." A Host Name is a name assigned to a device connected to a computer network that is used to identify the device in various forms of electronic communication, such as communications over the Internet;

h. "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

i. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

j. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected

4

by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider ("ISP") over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

k. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. IP addresses are also used by computer servers, including web servers, to communicate with other computers.

l. Media Access Control ("MAC") address. The equipment that connects a computer to a network is commonly referred to as a network adapter. Most network adapters have a MAC address assigned by the manufacturer of the adapter that is designed to be a unique identifying number. A unique MAC address allows for proper routing of communications on a network. Because the MAC address does not change and is intended to be unique, a MAC address can allow law enforcement to identify whether communications sent or received at different times are associated with the same adapter.

m. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

n. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

o. "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address. URLs are made of letters, numbers, and other symbols in a standard form. People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

5

1     p. "Visual depictions" include undeveloped film and videotape, and data stored on computer
2         disk or by electronic means, which is capable of conversion into a visual image. See 18
3         U.S.C. § 2256(5).
4     q. "Website" consists of textual pages of information and associated graphic images. The
5         textual information is stored in a specific format known as Hyper-Text Mark-up
6         Language ("HTML") and is transmitted from web servers to various web clients via
7         Hyper-Text Transport Protocol ("HTTP");

**BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE**

6. SPARKS has been linked to an online community of individuals who regularly send and receive child pornography via a website that operated on an anonymous online network. The website is described below and referred to herein as "Website A."[1] There is probable cause to believe that SPARKS accessed with intent to view material on "Website A" containing child pornography, and knowingly received child pornography from "Website A" and from other locations on the Internet.

### The Network[2]

7. "Website A" operated on a network ("the Network") available to Internet users who are aware of its existence. The Network is designed specifically to facilitate anonymous communication over the Internet. In order to access the Network, a user must install computer software that is publicly available, either by downloading software to the user's existing web browser, downloading free software available from the Network's administrators, or downloading a publicly-available third-party application.[3] Using

---

[1] The actual name of "Website A" is known to law enforcement. Disclosure of the name of the site would potentially alert its members to the fact that law enforcement action is being taken against the site and its users, potentially provoking members to notify other members of law enforcement action, flee, and/or destroy evidence. Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the website will be identified as "Website A."

[2] The actual name of the Network is known to law enforcement. The network remains active and disclosure of the name of the network would potentially alert its members to the fact that law enforcement action is being taken against the network, potentially provoking members to notify other members of law enforcement action, flee, and/or destroy evidence. Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the network will be identified as "the Network."

[3] Users may also access the Network through so-called "gateways" on the open Internet, however, use of

6

the Network prevents someone attempting to monitor an Internet connection from learning what sites a user visits and prevents the sites the user visits from learning the user's physical location. Because of the way the Network routes communication through other computers, traditional IP identification techniques are not viable.

8. Websites that are accessible only to users within the Network can be set up within the Network. "Website A" was one such website. Accordingly, "Website A" could not generally be accessed through the traditional Internet.[4] Only a user who had installed the appropriate software on the user's computer could access "Website A." Even after connecting to the Network, however, a user had to know the exact web address of "Website A" in order to access it. Websites on the Network are not indexed in the same way as websites on the traditional Internet. Accordingly, unlike on the traditional Internet, a user could not simply perform a Google search for the name of "Website A," obtain the web address for "Website A," and click on a link to navigate to "Website A." Rather, a user had to have obtained the web address for "Website A" directly from another source, such as other users of "Website A," or from online postings describing both the sort of content available on "Website A" and its location. Accessing "Website A" therefore required numerous affirmative steps by the user, making it extremely unlikely that any user could have simply stumbled upon "Website A" without first understanding its content and knowing that its primary purpose was to advertise and distribute child pornography.

9. The Network's software protects users' privacy online by bouncing their communications around a distributed network of relay computers run by volunteers all around the world, thereby masking the user's actual IP address which could otherwise be used to identify a user.

10. The Network also makes it possible for users to hide their locations while offering various kinds of services, such as web publishing, forum/website hosting, or an instant messaging server. Within the Network itself, entire websites can be set up which operate the same as regular public websites with one

---

those gateways does not provide users with the full anonymizing benefits of the Network.

[4] Due to a misconfiguration, prior to February 20, 2015, Website A was occasionally accessible through the traditional Internet. In order to access Website A in that manner, however, a user would have had to know the exact IP address of the computer server that hosted Website A, which information was not publicly available. As of on or about February 20, 2015, Website A was no longer accessible through the traditional Internet.

7

critical exception - the IP address for the web server is hidden and instead is replaced with a Network-based web address. A user can only reach such sites if the user is using the Network client and operating in the Network. Because neither a user nor law enforcement can identify the actual IP address of the web server, it is not possible to determine through public lookups where the computer that hosts the website is located. Accordingly, it is not possible to obtain data detailing the activities of the users from the website server through public lookups.

### Description of "Website A" and its Content

11. "Website A" was a child pornography bulletin board and website dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children, including the safety and security of individuals who seek to sexually exploit children online. On or about February 20, 2015, the computer server hosting "Website A" was seized from a web-hosting facility in Lenoir, North Carolina. The website operated in Newington, Virginia, from February 20, 2015, until March 4, 2015, at which time "Website A" ceased to operate. Between February 20, 2015, and March 4, 2015, law enforcement agents acting pursuant to an order of the United States District Court for the Eastern District of Virginia monitored electronic communications of users of "Website A." Before, during, and after its seizure by law enforcement, law enforcement agents viewed, examined and documented the contents of "Website A," which are described below.

12. According to statistics posted on the site, "Website A" contained a total of 117,773 posts, 10,622 total topics, and 214,898 total members as of March 4, 2015. The website appeared to have been operating since approximately August 2014, which is when the first post was made on the message board. On the main page of the site, located to either side of the site name were two images depicting partially clothed prepubescent girls with their legs spread apart, along with the text underneath stating, "No cross-board reposts, .7z preferred, encrypt filenames, include preview, Peace out." Based on my training and experience, I know that: "no cross-board reposts" refers to a prohibition against material that is posted on other websites from being "re-posted" to "Website A;" and ".7z" refers to a preferred method of compressing large files or sets of files for distribution. Two data-entry fields with a corresponding "Login" button were located to the right of the site name. Located below the aforementioned items was the message, "Warning! Only registered members are allowed to access the

8

section. Please login below or 'register an account' [(a hyperlink to the registration page)] with "[Website A]." Below this message was the "Login" section, consisting of four data-entry fields with the corresponding text, "Username, Password, Minutes to stay logged in, and Always stay logged in."

13. Upon accessing the "register an account" hyperlink, there was a message that informed users that the forum required new users to enter an email address that looks to be valid. However, the message instructed members not to enter a real email address. The message further stated that once a user registered (by selecting a user name and password), the user would be able to fill out a detailed profile. The message went on to warn the user "[F]or your security you should not post information here that can be used to identify you." The message further detailed rules for the forum and provided other recommendations on how to hide the user's identity for the user's own security.

14. After accepting the above terms, registration to the message board then required a user to enter a username, password, and e-mail account; although a valid e-mail account was not required as described above.

15. After successfully registering and logging into the site, the user could access any number of sections, forums, and sub-forums. Some of the sections, forums, and sub-forums available to users included: (a) How to; (b) General Discussion; (c) [Website A] information and rules; and (d) Security & Technology discussion. Additional sections, forums, and sub-forums included (a) Jailbait – Boy; (b) Jailbait – Girl; (c) Preteen – Boy; (d) Preteen – Girl; (e) Pre-teen Videos – Girl HC; (f) Pre-teen Videos – Boys HC; (g) Toddlers; and (h) Kinky Fetish – Scat. Based on my training and experience, I know that "jailbait" refers to underage but post-pubescent minors; the abbreviation "HC" means hardcore (i.e., depictions of penetrative sexually explicit conduct); and "scat" refers to the use of feces in various sexual acts, watching someone defecating, or simply seeing the feces. An additional section and forum was also listed in which members could exchange usernames on a Network-based instant messaging service that I know, based upon my training and experience, to be commonly used by subjects engaged in the online sexual exploitation of children.

16. A review of the various topics within the above forums revealed each topic contained a title, the author, the number of replies, the number of views, and the last post. The "last post" section of a particular topic included the date and time of the most recent posting to that thread as well as the author.

9

Upon accessing a topic, the original post appeared at the top of the page, with any corresponding replies to the original post included in the post thread below it. Typical posts appeared to contain text, images, thumbnail-sized previews of images, compressed files (such as Roshal Archive files, commonly referred to as ".rar" files, which are used to store and distribute multiple files within a single file), links to external sites, or replies to previous posts.

17. A review of the various topics within the "[Website A] information and rules," "How to," "General Discussion," and "Security & Technology discussion" forums revealed that the majority contained general information in regards to the site, instructions and rules for how to post, and welcome messages between users.

18. A review of topics within the remaining forums revealed the majority contained discussions about, and numerous images that appeared to depict, child pornography and child erotica depicting prepubescent girls, boys, and toddlers. Examples of these are as follows:

    a. On February 3, 2015, a user posted a topic entitled "Buratino-06" in the forum "Pre-teen – Videos - Girls HC" that contained numerous images depicting child pornography of a prepubescent or early pubescent girl. One of these images depicted the girl being orally penetrated by the penis of a naked male;

    b. On January 30, 2015, a user posted a topic entitled "Sammy" in the forum "Pre-teen – Photos – Girls" that contained hundreds of images depicting child pornography of a prepubescent girl. One of these images depicted the female being orally penetrated by the penis of a male; and

    c. On September 16, 2014, a user posted a topic entitled "9yo Niece - Horse.mpg" in the "Pre-teen Videos - Girls HC" forum that contained four images depicting child pornography of a prepubescent girl and a hyperlink to an external website that contained a video file depicting what appeared to be the same prepubescent girl. Among other things, the video depicted the prepubescent female, who was naked from the waist down with her vagina and anus exposed, lying or sitting on top of a naked adult male, whose penis was penetrating her anus.

19. A list of members, which was accessible after registering for an account, revealed that

approximately 100 users made at least 100 posts to one or more of the forums. Approximately 31 of these users made at least 300 posts. In total, "Website A" contained thousands of postings and messages containing child pornography images. Those images included depictions of nude prepubescent minors lasciviously exposing their genitals or engaged in sexually explicit conduct with adults or other children.

20. "Website A" also included a feature referred to as "[Website A] Image Hosting." This feature of "Website A" allowed users of "Website A" to upload links to images of child pornography that are accessible to all registered users of "Website A." On February 12, 2015, an FBI Agent accessed a post on "Website A" titled "Giselita" which was created by a particular "Website A" user. The post contained links to images stored on "[Website A] Image Hosting." The images depicted a prepubescent girl in various states of undress. Some images were focused on the nude genitals of a prepubescent girl. Some images depicted an adult male's penis partially penetrating the vagina of a prepubescent girl.

21. Text sections of "Website A" provided forums for discussion of methods and tactics to use to perpetrate child sexual abuse.

    a. On January 8, 2015, a user posted a topic entitled "should i proceed?" in the forum "Stories - Non-Fiction" that contained a detailed accounting of an alleged encounter between the user and a 5 year old girl. The user wrote "...it felt amazing feeling her hand touch my dick even if it was through blankets and my pajama bottoms..." The user ended his post with the question, "should I try to proceed?" and further stated that the girl "seemed really interested and was smiling a lot when she felt my cock." A different user replied to the post and stated, "...let her see the bulge or even let her feel you up...you don't know how she might react, at this stage it has to be very playful..."

<u>Court Authorized Use of Network Investigative Technique</u>

22. Websites generally have Internet Protocol ("IP") address logs that can be used to locate and identify the site's users. In such cases, after the seizure of a website whose users were engaging in unlawful activity, law enforcement could review those logs in order to determine the IP addresses used by users of "Website A" to access the site. A publicly available lookup could then be performed to determine what Internet Service Provider ("ISP") owned the target IP address. A subpoena could then be sent to that ISP to determine the user to which the IP address was assigned at a given date and time.

23. However, because of the Network software utilized by "Website A," any such logs of user activity would contain only the IP addresses of the last computer through which the communications of "Website A" users were routed before the communications reached their destinations. The last computer is not the actual user who sent the communication or request for information, and it is not possible to trace such communications back through the Network to that actual user. Such IP address logs therefore could not be used to locate and identify users of "Website A."

24. Accordingly, on February 20, 2015, the same date "Website A" was seized, the United States District Court for the Eastern District of Virginia authorized a search warrant to allow law enforcement agents to deploy a Network Investigative Technique ("NIT") on "Website A" in an attempt to identify the actual IP addresses and other identifying information of computers used to access "Website A." Pursuant to that authorization, between February 20, 2015, and approximately March 4, 2015, each time any user or administrator logged into "Website A" by entering a username and password, the FBI was authorized to deploy the NIT which would send one or more communications to the user's computer. Those communications were designed to cause the receiving computer to deliver to a computer known to or controlled by the government data that would help identify the computer, its location, other information about the computer, and the user of the computer accessing "Website A." That data included: the computer's actual IP address, and the date and time that the NIT determined what that IP address was.

### CRAZYCATS ON "Website A"

25. According to data obtained from logs on "Website A," monitoring by law enforcement, and the deployment of a NIT, a user with the user name "CRAZYCATS" engaged in the following activity on "Website A."

26. The profile page of user "CRAZYCATS" indicated this user originally registered an account on "Website A" on March 3, 2015. Profile information on "Website A" may include contact information and other information that is supplied by the user. It also contains information about that user's participation on the site, including statistical information about the user's posts to the site and a categorization of those posts. According to the user "CRAZYCATS's" profile, this user was a Newbie Member of "Website A." Further, according to the Statistics section of this user's profile, the user

"CRAZYCATS" had been actively logged into the website for a total of approximately three hours and 13 minutes between the dates of March 3, 2015, and March 4, 2015.

### IP Address and Identification of User "CRAZYCATS" on "Website A"

27. According to data obtained from logs on "Website A," monitoring by law enforcement and the deployment of a NIT, on March 3, 2015, the user "CRAZYCATS" engaged in the following activity on "Website A" from IP address 108.94.13.155. During the session described below, this user browsed "Website A" after logging into "Website A" with a username and a password.

28. On March 3, 2015, the user "CRAZYCATS" with IP address 108.94.13.155 accessed the post entitled "Estefy (Latina Anal) Deep anal creampie – asi se mama linda.3gp" in the "Pre-teen Videos – Girls HC" forum. Among other things, this post contained a preview image, also known as a contact sheet, as well as hyperlinks to external websites containing copies of the contact sheet and the full file. Numerous replies to this post were also made by other users. The contact sheet contained approximately 20 smaller images; the majority of which contained child pornography depicting a prepubescent or early pubescent female, including those depicting this female with her legs spread apart, exposing her vagina, which was being penetrated by a male's penis.

29. During the period from March 3, 2015, through March 4, 2015, the user "CRAZYCATS" also browsed approximately 97 additional threads on "Website A" after logging in with his username and password. During these sessions, the user's IP address information was not collected. Examples and descriptions of these additional browsing sessions are as follows:

    a. On March 3, 2015, the user "CRAZYCATS" accessed the post entitled "Insertions, objects and fun with toys!" Among other things, this post contained approximately 90 attached images. Numerous replies to this post were also made by other users. The majority of the images contained child pornography and child erotica depicting prepubescent and early pubescent females, including those depicting these females with their legs spread apart, exposing their vaginas.

    b. On March 4, 2015, the user "CRAZYCATS" accessed the post entitled "Quickie..But goodie." Among other things, this post contained a preview image, also known as a contact sheet, and hyperlinks to external websites containing the full files. Numerous

replies to this post were also made by other users and several of these posts also contained contact sheets. These contact sheets contained dozens of smaller images; the majority of which contained child pornography and child erotica depicting prepubescent or early pubescent females, including those depicting a prepubescent female being orally penetrated by a male's penis.

30. Using publicly available websites, FBI Special Agents were able to determine that the above IP Address was operated by the Internet Service Provider ("ISP") AT&T.

31. In April 2015, an administrative subpoena/summons was served on AT&T requesting information related to the user who was assigned to the above IP address at the date and time that the NIT (described in Paragraph 28) was deployed. According to the information received from AT&T, a subscriber who lived with SPARKS was assigned that IP address at the date and time in question, using Internet service at a residence in Oroville, California.

32. On October 15, 2015, pursuant to the authority of a search warrant issued by the Honorable Carolyn K. Delaney, law enforcement agents executed a search warrant at SPARKS's residence to search for evidence of child pornography crimes.

33. On October 15, 2015, SPARKS informed agents that he had used "The Network" to access "Website A" for the purpose of locating and downloading child pornography. SPARKS informed agents that they would find child pornography on a computer of his, and told the agents the location on the computer where the pornography was located.

34. Between October 15, 2015, and April 26, 2016, forensic review of the computer and a cellular telephone, both seized pursuant to the search warrant described above in Paragraph 32, confirmed the existence of child pornography. Agents located approximately 24 videos, 22 of which appear to contain child pornography. The remaining two videos include what appear to be a gang rape, and a voyeuristic video of a prepubescent female changing at a beach. The videos located on the phone are an additional subset of the videos contained on the computer. The videos were found in locations where SPARKS told law enforcement agents they would find the child pornography. An example of one of the videos is filename: "Babyski Kanga 005 3Yo (hard).avi," which is a 1:52 minute color video with sound. This video depicts a partially nude prepubescent female being held down on her back and vaginally

penetrated by a male's erect penis. The prepubescent female cries while being penetrated by the adult male. The adult male then flipped the female onto her stomach and continued to penetrate her from behind. This video was located on Spark's personal computer, as well as on his cellular telephone. Another example of one of the videos is filename: "lis mama y culea en 4[234189].wmv," which is a 7:04 minute color video with sound. This video depicts a nude prepubescent female performing oral sex on an adult male's erect penis. The adult male then positions the prepubescent female face down on a bed, rubs his erect penis against her vagina and then anally penetrates the prepubescent female. The female begins to cry during the last minute of this video. This video was located on Spark's personal computer.

35. On April 26, 2016, SPARKS was interviewed by the FBI again. During that interview, he described his child pornography collection habits. He confirmed that he downloads child pornography from the Internet, particularly from websites on "The Network" including, at one point, "Website A." He stated that he collects the child pornography in cycles. He downloads child pornography, then deletes all of it, and eventually returns to Internet websites to download it again. He explained that he downloads the materials onto his computer, and then transfers some of the child pornography to his cellular phone so that he can take it with him and, on occasion, masturbate to the images on his cellular phone.

36. In response to questioning by law enforcement agents, on April 26, 2016, SPARKS admitted that between November 2012 and the spring of 2013, he engaged in sexual abuse of a minor who was approximately six years old, on approximately five occasions. The abuse included rubbing the minor in a sexual way, having the minor rub SPARKS, inserting his fingers into the minor's vagina, orally copulating the minor, masturbating in the presence of the minor, and ejaculating onto the minor. On one of the five occasions, the minor cried out in protest, and the minor's eight year old sibling tried to intervene, but SPARKS told the eight year old that nothing was happening. The eight year old was unable to open the door to the room where the abuse occurred because SPARKS had locked the door from the inside.

## Conclusion

37. Based on the foregoing, there is probable cause to believe that between February 2015 and

October 2015, Jason Sebastian SPARKS violated 18 U.S.C. § 2252(a)(2) (receipt of child pornography) when he knowingly downloaded child pornography from the Internet, including "Website A" on the "The Network" and from other websites on "The Network."

*Special Agent Matthew Catalano*
Federal Bureau of Investigation

APPROVED AS TO FORM BY:

BRIAN A. FOGERTY
Assistant United States Attorney

Subscribed and sworn to before me on: 4-27-2016

Hon. Edmund F. Brennan
United States Magistrate Judge

16

## United States v. Jason Sebastian Sparks
### Penalties for Complaint

**Defendant**

**JASON SEBASTIAN SPARKS**

**COUNT 1**

VIOLATION:    18 U.S.C. § 2252(a)(2) -- Receipt of Child Pornography

PENALTIES:    Mandatory minimum of 5 years in prison and a maximum of up to 20 years; or
Fine of up to $250,000, or both fine and imprisonment
Supervised release of at least 5 years up to life

SPECIAL ASSESSMENT: $100